Thank you, Your Honor. May it please the Court, Michael Poli on behalf of the plaintiff, who is also the appellant. I'm going to concentrate most of my time on what we view as the core issue on appeal, which is the entry of summary judgment in favor of defendant State Farm on what is essentially a question of interpreting and then applying the language of an insurance policy to the facts in the record. And because it's an appeal from a summary judgment, both sides agree that this is de novo review on the part of this Court. Let me ask you, there's something that I'm not able to ascertain in the record. Would State Farm's proposed method of replacing only the damaged wood floors cause any visual mismatch in the existing floor? Or is it in the event that Mr. Chapman remodels and removes the interior walls that the mismatch would be apparent? Well, in terms of a visual mismatch, it would only be apparent to the naked eye if an interior wall is moved. Then it would be really apparent, would be like a very ugly eyesore. But the matching concept is in part related to a visual mismatch, but in part related to simply a mismatch. You know, there's a lot of case law out there dealing with matching. And, you know, it's surprising how long these very lengthy adhesive insurance policies still do not define a great many terms. And two of the most critical terms that are not defined here are, of course, equivalent construction and use, which is within the State Farm policy. And then also like, kind, and quality. I was just trying to get the aesthetic point. If he doesn't move the walls out, it wouldn't mismatch. It's if he moves the walls out. Yeah, it would not be a visual mismatch that is apparent to the eye unless one of the interior walls is moved. We believe it would still be a mismatch. And let me ask you this. Do you have a case that you can cite us where, in fact, the insurers required to, say, replace undamaged walls and floor where the visual mismatch would occur only if the walls are moved later? I don't know. The closest case that we cited, of course, is the 160 Lee Street case, which I think is really pretty on point. No, because that one had to do with siding, where it was obvious that they weren't going to match if they didn't replace all the siding. Correct. There was a visual mismatch there. But the point is, the premise for the matching cases is that there is an obligation of indemnity. These replacement cost policies are different than other forms of insurance. For the most part, if you total your car and it's 10 years old, they give you the value of a 10-year-old car. But unlike that, with homeowners insurance and other property insurance, for that matter, these replacement cost policies are often referred to as new for old. We cited the Southern District case, a New York case arising out of the World Trade Center terrorism, and there are many other cases that talk about it. But a replacement cost policy is typically viewed as new for old. You can have a 10-year-old roof, and if it needs to be replaced, you get a new roof in place of the old roof. Because of the nature of these policies, you don't get that for free. Policyholders pay extra money in the form of premiums to get that replacement cost coverage. If you look at it, the policy language, as I just mentioned, has two pretty critical phrases that are not defined and which should be interpreted. If there's ambiguity, and there certainly is, we would submit, it should be interpreted under Washington law, and this is under Erie. This is a diversity case. We apply Washington law. Those should be interpreted in favor of the insured. Again, those phrases are equivalent construction and use and like, kind, and quality. We think that no reasonable insured would think that if they're promised like, kind, and quality and equivalent construction and use, that that means in order to save money, that the insurance carrier sends in a contractor with a sawzall, and they cut out the floor up to the interior walls because they don't want to spend the money to move the wall, and then they put in a new floor up to that point, leaving old, according to our testimony, which was presented to the trial court. The trial court said that we didn't present the facts. We did, and I can point that to the record. But that would leave those pieces of that floor underneath those vertical interior walls that have been subjected, probably not as much to fire, but fire often does the least damage in these situations. Smoke goes everywhere, but even more, chemicals in the water that is used to put out the fire go everywhere. And I don't think anyone would think, if I'm buying insurance, that when I'm promised replacement costs, equivalent construction and use, and like, kind, and quality, I get this, you know, sawzalled floor when all is said and done, so that State Farm can save money by replacing the entire floor, by not replacing the interior walls. Okay. What is the evidence in the record of actual smoke or water damage to the walls of the house? Let me find my notes here. So we did a further, I mean, so when I sat down to do the reply brief, the record was so gigantic that what we took, and we did what I'm calling an FER, further excerpt of record. It's all stuff from the original record, but I tried to be more selective, and I highlighted it. And so if we go to that further excerpt of record, which is from the original record, we have the testimony of the public adjuster, who is Mr. Mabe. And if we go to the FER, starting at page 37 in the FER, he expressly, again, he probably could have been more precise, but he clearly said it's damage to all the wood flooring. So it starts off on line 11. Isn't it possible, Mr. Mabe, to cut out and remove subflooring or finished flooring from around an interior wall using a sawzall, you know, a type of reciprocating saw or a similar tool? And the answer, you can use a sawzall or a chainsaw or a skill saw to cut out flooring. Question, is that a method that you would recommend for the Chapman House? No. Why is that? That's not what they had before the fire, which is the indemnity issue. Question, they didn't have what before the fire? Answer, flooring that was cut out by a sawzall. And then to answer the question on the next page, question, what would you say they are owed in that settlement in the example that you use in phase A? Well, we've written it for new FER flooring. And why is that? Because it's damaged for flooring. We also, in the record, is the testimony of the claims handling expert, Gary Williams. And this is in the FER, starting at page 49. And the question by the state fire lawyer, in addition to getting actual fire damage when you have a fire, what other things can cause damage to the structure? Answer, well, water is a big one. Sometimes water causes more damage than fire did. Then after a little time goes by, because you had water and because you had toxic smoke from the fire, it's real common to get bacteria or mold problem that comes from that. That's saying it's possible, but what is the actual evidence of smoke or water damage in the walls? Your Honor, we have the testimony we have. We probably could have had an expert right on point saying, here's the damage with destructive testing. We don't have that, but this is a summary judgment motion where all disputed facts are viewed in favor of the insured in this case and all disputed inferences. And we just do not believe. Now, look, we might have gone to trial and a jury might have said, well, gee, you don't have enough experts. You don't have an expert right on point. So you lose. And if that happens, that happens. But we don't believe it was proper to pull the trigger on a summary judgment based on this record. Could the record have been stronger? I will concede the record could have been stronger and it might have been stronger with a more precise expert who had done so-called DT or destructive testing. Are the repairs on this house almost more than it's worth? Yeah, and that's probably so. I mean, it's a 1909 house. But again, that points out the nature of replacement cost coverage, okay? It might not be economically logical. And I believe what Mr. Chapman and his wife did is at some point they tore the house down and started over. But that misunderstands the nature of this coverage. It is replacement cost coverage, and that works in a two-stage method. No, we're not going to have a remodel then. We're not going to have the mis- No. I mean, given the delay, that issue is moot at this point. But the point is, in order to calculate ACV, actual cost value, you've got to start with replacement cost value, okay? And so then if they have an abnormally or artificially low replace RCV, and then they depreciate it to get to ACV, then the ACV is too low. And it is entirely appropriate under these RCV policies for someone to take the ACV and say, I'm not going to seek what's called the holdback or the delta, the difference, the depreciation. I'll take the ACV and move on. But in this case, because they started off with an artificially low RCV, they also ended up with an artificially low ACV, and that wasn't fair to this insured. And I didn't write the policy. The court didn't write the policy. Counsel? Yes. I appreciate your explanation, but we know the record and we understand the nature of the policy. I'm looking at your further supplement of record at 34. It's a photograph, and I just want to make sure I'm understanding what we're talking about here. We'll find out. Okay, yes, I'm there. Okay, this is a photograph, and it seems to show the part of the wall that we're talking about, the part of the floor that wouldn't be replaced if they did the Sawzall method. Is that right, this discolored portion? That's my understanding. And so I think there are other photos, but I didn't want to burden the court with too much. But that is an example of this. Okay, I'll take it as a yes if the answer is yes. Is the answer yes? Yes, the answer is yes. Okay, that's what we're talking about. So then could you circle back, please, to Judge Gilman's question? Because his question, I think, is a really good question. And that is that you've got this maybe, opposing counsel would say, speculative damage, which is, on the one hand, as Judge Callahan said, it's an antique house. And I think given the nature of the policy, they have to put it back the way you described to, as you said, old for new. On the other hand, your client wasn't going to incur this particular damage unless the house was remodeled. And what you've now just thrown into the record is that that condition can't happen because they've torn the house down? Is that right? Again, I'm not sure. I believe that, given the passage of time, they decided to start over and rebuild a different structure on the property. I don't think that's in the record. But I also think it's irrelevant. I think that the issue is whether the replacement cost was calculated properly, and from that, whether the ACV was calculated properly. Go ahead. I'm sorry. Well, wait a minute. I think you had a good argument. If we think of this house as an antique, and I don't know what we do with this, if we think of this house as an antique, and so your client's paying a particular premium, it's a heightened premium for such a risk, then it sometimes is the case that to put it back the way it was, whether it's a car or a house or anything else, it's not necessarily what we would do. Not necessarily economically feasible. Sometimes it costs a whole lot more, but that's what they're paying for. That's the coverage they're paying for. But what do we do with the fact, if it is a fact, because it's news to me, that this house doesn't exist? So the eventuality you were concerned about, which is you had a house where a wall could have been moved and it could have been sold that way, if you're telling us you've torn it down, what do we do about that? I think your damage theory really hinged upon that. Actually, so number one, that's not on the record. Number two, I probably shouldn't have spoken off the cuff, because I think that's what happened, but I'm not totally sure, and I'd have to check with Mr. and Mrs. Chapman. This case has been on appeal for quite a while. But number three, we don't think that really matters, given the nature of RCV and ACV. And the point is, if the insured in this or any other matter, wishes to take the ACV payment and not rebuild, it is commonly accepted with this kind of insurance that they have that option if they wish. But they still need to be paid fairly and properly for ACV as a derived figure from RCV. Let me point one other thing out about RCV. There was a form of coverage that could have potentially limited State Farms' obligation. This is in the papers, including the papers to the trial court, which is functional replacement costs, which is actually designed. But it's not an issue here. It's not an issue here. We read the file, so I don't want to take up all of it. You want to reserve a minute for rebuttal? Yes, I do. But I certainly want to answer any questions. Well, I don't think we have more questions right now. That's fine. I'll reserve my last minute for rebuttal. Okay. Thank you. Thank you, Your Honor. All right. We'll hear from Mr. Adekim. Adanky. Oh, I didn't get that. Oh. That's okay. Oh, we have an M. The calendar's got an M at the end of your name. Say what it is. Adanky? Adanky. I've been used to that my whole life, so it's not a problem. May it please the court, my name is Vasu Adanky. In addition to my colleague, Kara Treadway, we represent State Farm and Casualty Company. I'll just get straight to the issues that we were discussing. I'm kind of wondering what I don't know here. There's always, like, all right, you put stuff in the briefs, and then we just found out that the house is probably torn down at this point. It's like, you know, I'm wondering why State Farm is spending all this money on this, when I think the attorneys probably, what we've spent on attorney's fees and briefs and all of that could have resolved this case. So what am I missing here? Well, Your Honor. You know, it's kind of why, is this sort of like a Middle East, you know, trying to get a treaty here, or whether Israel should have, you know, a separate country, or what's going on here? Your Honor, I mean, I don't want to get too far astray into, you know, some of the negotiations that we're going back and forth and trying to resolve this matter. Is the house down now from your standpoint, or do you know if it's torn down or not? It has been torn down. It was torn down a while ago. It's, yeah, it has been torn down a while ago. Is that anywhere in the record? I I'm trying to think, Your Honor. If he was in a summary judgment briefing. I don't recall offhand, but it has. Before summary judgment. Well, before some of the judges, it was torn down, Your Honor, I believe. Just a few months after a suit had been filed. So I think it was sometime around two. I want to get my dates. It was 2017 or something. It's been torn down for a while now. Okay, counsel. Can I get you to focus on the, whether the district, I think the district court thought there wasn't evidence from the plaintiff's team on this, on this point about the mismatch. I think the district court thought there wasn't evidence. Is your, is your, do you continue to argue that there isn't evidence of this? There is no evidence. Exactly. Your Honor of the floor. There is no evidence of the mismatch. And this is the classic example of putting the cart before the horse. Here we have a situation where the state farms retained a contractor, a local contractor called Covington construction. Went through a series of estimates to repair the house. The contract construction's conclusion was that it had the ability to repair the floor, the damaged portions of the floor. And after it was done, finishing it, sanding it, repairing it, that there was not going to be a visual mismatch. And the light kind of quality. Counsel your briefs keep saying that, but you're not speaking to this strip under that's why I pointed. Because we seem to be miscommunicating to this photograph, right? The strip of floor under the wall. And we've all read maybe more than we want to know about how, how homes used to be built in walls, you know, to be put on top of the floors and all. So what about this strip that we're looking at in the photo, please? I don't think your expert testified to this at all. Well, the expert testified primarily about the, the fact that this was not a continuous uninterrupted set of for planks, but having a different issue entirely. I understand. I understand. I think this is what you're seeing here as a, I think it's a FRA 34 is not the finished floor. It's not like this is the finished floor and there is a visual mismatch. Covington had stated, and it's in the record that it was what, it has the capability of repairing the force that would not be a mismatch. And also it's in the record, and this is critical. And I think appellants also state this in their briefing, that if there is any additional covered damage that is discovered during the course of work, state farm would pay for that. So for example, if the work had actually commenced here, which it never did, and that's part of the issue because the house was destroyed several months later, if the work had actually commenced here, and then we came to a point where there was a visual mismatch, then if it was considered covered and under the light kind of quality language and under the one 60 lead case, you would arguably would be, then state farm would have paid for and rectified the mismatch. But there's an argument here by appellants, that there was going to be a mismatch without even getting there. Now, even the one 60 lead in Presbyterian, the two cases, the appellant site, they discovered the mismatch or the potential for a mismatch after the work had commenced. Here, there is no obligation. That's the whole point of the summary judgment briefing, which the district court agreed with. There is no obligation under the terms of this policy and the case law interpreting light kind of quality to replicate, and that's critical, or replicate construction techniques. It's not about replicating construction techniques. Your brief talks a lot about techniques. And it just seems to me every case where your briefs are talking right past each other and your experts certainly were. So regardless of what techniques you use or anybody uses, what they're arguing, and I just want your fair response here, what they're arguing is the obligation was to put it back the way it was, even if that makes not very much economic sense. And particularly since this is an antique house, I'm calling it, that's my word, an antique house. What is your response to that? Is that not the obligation? And if not, why not, please? There is no obligation. That was the basis of the summary judgment motion that was granted under the case law. There is no obligation to replicate the construction techniques. And I'm sorry, I don't mean to repeat that just to annoy the court, but I'm trying to, the point I'm trying to make here. I'm just telling you, you lose my vote if you do. You lose my vote because that is not the issue. My question that would be helpful if you could answer is, is there an obligation under this kind of policy to restore the property and the condition that it was before the fire? Yes. And that's what State Farm was going to do. There's no evidence that it was not going to do that. And that's critical. State Farm knows its obligation, return it to the pre-loss condition. That's what it was estimating to do. And that is its obligation. Certainly State Farm is not shirking that responsibility. It's a different policy. It's a different, they're paid more for this policy to have it restored. Right? Well, replacement cost coverage, that is generally the situation. Most of the policy State Farm issues are replacement cost, replacement cost policy. So let me ask you this. If the summary judgment that was granted is affirmed, how much do you owe them now? If the summary judgment that was granted was affirmed, we don't owe any more than what was paid in its most recent ACB payment. Which was about, what, $98,000? That's right, Your Honor. What about this? The plaintiff's whole argument, if I understand it, is that what they've lost by your method of wanting to do it is that if they had decided to remodel by removing the interior walls, there then would have been the mismatch, the smorgasbord. And that they're entitled to the value of what it would have been if they had wanted to remodel. Now, do you have any case that says State Farm has no obligation to worry about, well, if the homeowner wants to remodel, that, yeah, he's going to have a problem with what you want to do? Yes. Well, I can say this policy language in general, and even the 160 Lee case, only obligates the house to be returned to its pre-loss condition. So if you have a sub-floor, and this is, most of the fur was a sub-floor, by the way. It wasn't actually the floor. But if there were, the only obligation is to return to the pre-loss condition. So pre-loss, if there was a wall covering part of that floor, that was all that was obligated to be returned to, unless there was demonstrable evidence of damage under those walls to the floor. But if the pre-loss condition was, these walls were resting on top of the floor, then that's the only obligation of State Farm, to return it to that pre-loss condition. If the insured wants to then do something later and knock down that wall or whatever, that is not pre-loss condition. Now you're changing the condition. That is no longer pre-loss condition. That's a new post-loss condition. And what that would result, essentially, is an insurance company paying for future non-fortuitous losses. That's not what insurance policies are designed for. They're designed for unknown fortuitous losses, something that happens accidentally, something that is not specifically intended. So if there is something- Could you still make that argument? Let's say, I don't know how many walls there are, but let's say they'd taken down one and they were in the middle of a remodel when this happened. Then it wouldn't be so speculative. Would you have to pay for it then? Well, I think it's a good question, Judge Callen. Well, thanks, but do you have a good answer? I do. I do, actually. It's a claim-by-claim situation. You cannot come into these claim situations with just a blanket type of coverage analysis or construction analysis. If the insured, for example, can demonstrate that they were going to remove wall A in this room and that wall A had suffered fire damage and the floor underneath had suffered fire damage and things of that nature, then yes, it is possible that even though it may be part of a remodel, it still has to satisfy the terms of a policy of the insuring agreement. But even though it may be part of a remodel, it certainly could be covered and repaired or replaced. So I certainly am not sitting here- It sounds like neither one of you have case law right on point. It sounds like neither one of you have case law right on point. Is that fair to say? Well- You're relying on your policy language. Judge Callahan asked you a different question, or perhaps it was Judge Gilman. Do you have a case law about this? And I don't hear either one of you saying you really do. There's the Lee case from Washington, right, talking about aesthetics. But in that case, the aesthetic difference was already visible, right? In this one, there was this condition about would the wall be removed? And so it's a little bit different. But I don't think you have a case on point either. So, although if you do, now would be the time to tell me. Well, a case on point, which obligates the insurer to- Which says that you don't have to put it back the way it was. I would- Well, I would submit that the Lee case does do that because the Lee case in Presbyterian, if we're talking about visual mismatch, that's the only thing they want to avoid. They don't obligate- And I think part of the reason, Your Honor, is there is scant case law on this. There isn't much out there. And so when State Farm- Okay, so you've answered my question. If you're both relying on Lee, I've read Lee several times. I know about Lee, so I appreciate that. But if that's the situation, I'm wondering why we're making new law when it looks to me like there's an error about whether there was a dispute of fact here, that the court might have missed, that there was conflicting testimony about whether this damage had been incurred. And I'm wondering about the next most reasonable step here rather than making new law. Should we remand the case? And perhaps on remand people should talk about the fact that the house has been torn down? What should we do at this point? I'd like to hear from both of you on that. Did the district court know that, that the house had been torn down? I'm curious. Yes, it does. And I remember it was in Mr. Chapman's deposition testimony. So what is your answer to the question of what you think is the next best step for us to do given that there seems to be a mishear on whether there was a contradictory testimony from the plaintiffs? Well, I think the district court's decision should be affirmed. The district court spent quite a bit of time in looking through all the record in detail and what Your Honor characterized as contradicting testimony. The problem with that, as appellants characterized it as well, is that it was unsupported. It was speculative. You have in the deposition a claims handling expert for appellants stating, kind of make a throwaway statement, oh yeah, sometimes there could be fire suppression and water damage. No, no, I'm not asking about fire. I'm not asking about fire or water. That's why I want you to look at the photo, please. Okay. He has testimony in the record about if this wall is moved, then there's going to be this big obvious mismatch. So that's what I'm talking about. If you want to speak to that, that's fine, but you don't need to convince me of the water or smoke. Okay. Again, it's the obligation of State Farm was to return it to the pre-loss condition. If there is a visual mismatch here, as you can see here, then the company was obligated to ensure that that was not the case and to make it a uniform, aesthetically pleasing finished floor. If sometime in the future, insurers want to uproot that wall, that is their decision. That is an intentional action by their part to modify the pre-loss condition. Let me ask you this. To me, you both have problems. Okay. I'm just going to speak for myself. You both have some problems and you're not making this easy and maybe because there isn't exact law out there. Did you involve yourselves in our court mediation program previously? Yes. You both availed yourself to that before filing briefs? Yes. Yes, Your Honor. Okay. I don't know if the court is suggesting we revisit that option. I think we've asked both of you some hard questions and I'm not sure that either of you have given perfect answers for that. We haven't conferenced about this. I guess what I would suggest is that neither of you should be supremely confident in the result here, that if mediation were available, would that be something that you would have both availed yourself to and then we'd be prepared to rule after 30 days or whatever. I mean, we'll call the ball. That's what we do. Well, Your Honor, I can certainly discuss that with my client and if Your Honors are kind of pushing us in that direction, I certainly will. We haven't conferenced about this case, so I can't tell you what we're going to think at the end of it and we will decide it after it's really argued. But if I were a fly on the wall listening to the argument on this, I think both of you could walk away and say, I don't know if we completely satisfied the court in our answers to the questions. That puts a different state of mind on people. We're not mediators. We're going to call the ball. Understood. All right. Do either of you have any additional questions? I don't. All right. We're in overtime then, so that'll do it. Thank you. Thank you, Your Honor. Your Honor, I thought I had one minute. You do. You do. Okay. All I'm going to say is a follow-up on what Judge Kristen said. Put it back the way it was. The most fundamental core concept of this kind of insurance is summarized with the word indemnity. Indemnity means, simplistically, put it back the way it was. And this is what Mr. Mabe testified to, and this was the same testimony that was presented to the trial court. Specifically, it's in the excerpt of record. It meets at number 546. It's the page in the summary judgment response where all this was presented. Mabe said, you're not putting it back the way it was. It's not indemnity. And other than that, I certainly agree. This is probably not a cost-effective lawsuit, but it is all too common for large property and casualty carriers to sometimes be very stubborn on issues. But in any event, so we believe this case comes down to indemnity. And mismatching, mismatching is a problem. It's a bigger problem. This is a visual mismatch, but a mismatch is a mismatch. It's not indemnity. Thank you very much, unless anyone has any questions. All right. Neither of my colleagues have any additional questions. All right. It doesn't appear that we do, so this is the last case on for argument today. This court will stand in recess until tomorrow morning at 9 a.m. Thank you. Thank you. If the judges stay on, then we'll go to the roving room.
judges: Gilman, Callahan, Christen